Aloke Chakravarty (CO State Bar #52798)
(admitted *Pro Hac Vice*)
SAUL EWING LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
Telephone: 617-912-0949
Facsimile: 617-723-4151
E-mail: aloke.chakravarty@saul.com
Attorney for Defendant
DAVID OZER

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>DAVID OZER,<br>Defendant. | Case No. CR 24-00463 SB and<br>CR 24-00739 SB<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

**DEFENDANT'S SENTENCING MEMORANDUM**

### I.    INTRODUCTION

Defendant David Ozer accepts responsibility and expresses remorse for his crimes.[1] He hopes that incarceration will not be imposed, but if it is, he requests that a sentence of a year and a day be imposed as a split sentence with a portion served in community confinement, with a period of one year of supervised release. Given his need to make restitution, he requests no fine, $200 of special assessments, and a total of $421,496 in victim restitution, with $26,148 having been deemed satisfied. Mr. Ozer disputes the PSR's calculation of his net worth and ability to pay restitution, and

---

[1] *See* EXHIBIT 1 (Statement of David Ozer).

the portions of the PSR's sentencing guideline calculation as articulated in his objections and in this memorandum, not by contesting facts, but rather whether those facts warrant application of the Sophisticated Means enhancement, and that although unapplied, the Zero-Point Offender departure should apply.

## II.    FACTS AND CIRCUMSTANCES

Mr. Ozer's fall is the stuff of a tragic Hollywood drama. A self-made family man legitimately hustled to build a decades-long career in entertainment, only to be undone by a virtual siren-song leading to a series of destructive choices in an effort to cling to the status he had earned. It is an ancient tale of fall – but unlike many which play out in federal court, this was a limited episode caused by overwhelming stresses in his life where for a short time, he thought he could work out of it unscathed if a few things just broke his way. They did not.

David Ozer grew up in modest circumstances, earned a college degree, got married almost 30 years ago, and raised three remarkable children to adulthood. He worked his way up the entertainment ladder, developing his sales skills and developing content starting at a radio station and working in TV, movies and comic books. He earned a good living and worked at some of the industry's greatest brands, including Sony Pictures TV and 20th Century Fox TV. He helped market numerous productions, for original release, such as *Willy's Wonderland*, *Inside the Black Box*, and the DiC Kids Network, and syndications of *Seinfeld* and *Mad About You*. At his peak, he had worked at Landmark Studio Group, which developed numerous titles,

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

and joint ventured with a larger company, known as Chicken Soup for the Soul Entertainment (CSSE). Ozer received restricted shares for his joint venture, but the position was a mixed bag.  He exited the company, and although he was supposed to receive $1.45mm on paper, he never received that payment and CSSE has now gone bankrupt, and his severance is now worthless.[2] Ozer took Landmark to Strong Global Entertainment, a public company and began to work for its new subsidiary called Strong Studios ("Strong").  Ozer, partnered with other companies to get productions over the line; its partners had the financing, and Strong had the chutzpah and pluck to bring the deals together and to create the production and distribute them.

In 2022,  Strong partnered with Ravenwood entertainment to produce and launch an sci-fi thriller series Ozer had been working on for years, ironically called SafeHaven. After production, Ozer and others tried to sell the series, but there were no takers. Ozer was committed to the project, and Strong Studios paid an additional $700,000 to cover budget overruns during the production. The account originally established for the production had run dry, yet some expenses remained. Excess tax credits, received from budget overruns, were deposited into the account. As partners, Strong and Ravenwood were scheduled to proportionally share in the proceeds of any revenues. Similarly, although both had the opportunity to co-sign on the account, only

---

[2] As made clear in his objections, the PSR dramatically overstates Mr. Ozer's net worth based on his candid reporting of the "face value" of accounts receivable and intellectual property which he is not likely to ever receive. *See, e.g.,* share price ticker symbol CSSEQ ($0 as of April 22, 2025).

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Ozer exercised control over the Safehaven bank account.

Around May 2022, Mr. Ozer went on a business trip to drum up potential investors, putting on his Hollywood persona. Mr. Ozer's hamartia got the better of him when -- he visited a social media hookup app and connected with someone he thought was a lady looking for a successful man. Despite never meeting, Ozer shared a few messages and an innocuous photo. Unfortunately for Mr. Ozer, his inconspicuous correspondences ultimately led to his extortion.

Mr. Ozer began receiving threatening and extortionist text messages from his connection. Armed with his image and some personal details, the individual threatened to tell Mr. Ozer's wife and family that Ozer was "sick he likes paying underage escorts for sex" and attached text messages allegedly between Ozer and a female user. The extortionist sent hundreds of messages to Ozer, several of them threats to tell Mr. Ozer's family members, colleagues, and even his children's friends, providing contact information or sample messages to prove the veracity of his claims. *See* EXHIBIT 2 (Representative Sample of Extortionist Communications).[3] The extortionist also researched Mr. Ozer's business dealings, learned about his production partnerships, and even threatened to contact actors and other personnel slated to be in his productions. It was a particularly precarious time for Mr. Ozer, as his company Strong Studios was doing well with legitimate production deals and well

---

[3] *See* PSR at 11 n.4.

on its way toward a potential windfall-offering spinoff with Strong Global Entertainment. Mr. Ozer's personal and professional reputation hung in the balance of the extortionist's whim.

Mr. Ozer believed that the only way to avoid the embarrassment was to accede to the extortionist's payment demands, keeping them quiet and buying him more time pay his ransoms. To protect his reputation, his family's faith in him, and his business, David paid the extortionist not to engage in his personal and professional life. Between May 2022 and February 6, 2023, he sent over $275,000 from his personal and business accounts per the extortionist's instructions.[4] In all that time, Mr. Ozer had not committed a crime, but he had blown through whatever funds he could without raising questions with his wife or business partners.

By February 2023, Ozer was stuck. His weakening marriage was in no state to absorb these revelations were he to come clean to his family, particularly after the passage of time. He was barely keeping the extortionist at bay and was receiving daily threats with increasing urgency. Finally, on February 6, 2023, Mr. Ozer contacted the FBI through their Internet Crimes Complaint Center.[5] But they did nothing.[6]

Feeling on his own against the extortionist, Mr. Ozer then turned to the

---

[4] Of the monies wrongly obtained by Defendant, approximately $379,000 was transferred to the extortionist—the *sine qua non* of these regrettable offenses. *See* EXHIBIT 3 (Spreadsheet of Payments to Extortionist)

[5] *See* EXHIBIT 4 (David Ozer Report of Extortion February 6, 2023)

[6] More recently, the U.S. Secret Service and local authorities have taken up the investigation of the extortionist and have interviewed Mr. Ozer.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

DEFENDANT'S SENTENCING MEMORANDUM

accounts he had left under his control: the Safehaven account. He reasoned that he would be ultimately entitled to a share of the monies in those accounts at the end of the production, and at the end of February 2023, he began to dip into the Safehaven account. Desperate for capital, in March 2023, he began to solicit others to engage in potential production partnerships with him, for the development of scripts. These were legitimate projects, but he was desperate to get the cash as soon as possible to cover the amounts taken out of the Safehaven account. He started using the payments for future projects to pay for other existing obligations. In all, Mr. Ozer obtained approximately $202,500 in additional funds for projects that never got off the ground, and for which he didn't have the money to pay back.

Ravenwood eventually began asking questions about the absence of funds in the Safehaven account, and after an attempt to jerk them around, the jig was up. Although Mr. Ozer had started to reimburse the Safehaven account and Strong Global had paid the embezzled funds back, Ravenwood filed a civil lawsuit against Mr. Ozer and pushed for this case.

The publicity around the civil lawsuit and subsequent criminal case immediately ended Mr. Ozer's viability in Hollywood. Ozer decided to accept responsibility for his actions and agreed to a plea agreement and to cooperate with the government, proffering and providing them with information about other crimes with evidentiary documentation. However, Ozer's fortunes did not change. After the meeting, the government brought additional charges based on the additional victims

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

DEFENDANT'S SENTENCING MEMORANDUM

1    who emerged that didn't get paid back for their investments.

2         Mr. Ozer not only lost his money, his profession, his dignity and his reputation,

3    but his wife has left him, he's lost standing in his community, and he has suffered a

4    recent mental breakdown for which he had to be hospitalized.[7] He has suffered

5    tremendously, and he is prepared to face justice for his crimes. In this context,

6    understanding why these crimes are unlike those that revolve around greed or evil or

7

8    more common motivation, should help the Court fashion a punishment that does not

9    exacerbate the harm of this situation. A lengthy sentence today is not what this drama

10   deserves, and while Mr. Ozer is ruined, he can emerge to rebuild and repay. He has

11

12   shown his adaptability and resourcefulness, and there is no risk of his engaging in this

13   kind of conduct again – he will neither have the opportunity as his Hollywood career

14

15   is over, nor will he have the need, as the light has shone on the extortion.[8] The end of

16   this story should be one of mercy, to be constructive to the victims by being able to

17

18   earn restitution, and to redeem his life from the isolation of its lowest point.

19

20   ## III.    THE SENTENCING GUIDELINES

21        The Guidelines are "the starting point and initial benchmark" for determining

22   an appropriate sentence.[9] Here, the PSR calculates that Mr. Ozer's guideline range is

23

24   41–51 months' imprisonment. This is based on a total offense level of 22 and criminal

25

26   _____

27   [7] *See* EXHIBIT 5 (Discharge Note from Mental Health facility)
     [8] Even the extortionist has communicated their regret about destroying Mr. Ozer.
     *See* EXHIBIT 7 (Extortionist's confession)
28   [9] *Gall v. United States*, 552 U.S. 38, 49 (2007).

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

DEFENDANT'S SENTENCING MEMORANDUM

history category I. The PSR initially recommended a sentence of 18 months, which it increased to a still non-guidelines sentence of 30 months upon the subsequent information being filed, based on the § 3553(a) sentencing factors and without valuing the departure for coercion and duress under **§**5K2.12. A twelve month increase in sentence is simply too high for such little change in circumstances, which was one of the reasons for the bargain of the plea agreement. Although the Sentencing Zone options are like the rest of the Sentencing Guidelines, discretionary, the Guidelines specifically authorize a split sentence for defendants in Zone C.[10]   Notably, a 12-18 month sentence recommendation as Probation originally recommended, would be the equivalent as if Mr. Ozer were in Zone C.

After determining a defendant's guideline range, sentencing courts consider whether a departure is warranted.[11] In addition to determining the appropriateness of any departures, sentencing courts must also consider the § 3553(a) sentencing factors and whether they warrant a variance outside the advisory or adjusted guideline range. We address each in turn.

### A.    Not Sophisticated Means – USSG § 2B1.1(b)(10)(C)

The Guidelines provide for a two point increase as a specific offense characteristic if the defendant personally employed sophisticated means to perpetrate

---

[10] *See* USSG § 5C1.1(d).

[11] *See United States v. Ellis*, 641 F.3d 411, 416 (9th Cir. 2011) (describing process).

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

or conceal his fraud.[12]  This provision has been clarified to mean that it is only the exceptionally complex that warrants enhancement.[13]  The term "sophisticated means" is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."[14]

Mr. Ozer did not use especially complex or sophisticated means to perpetrate the fraud in this case. After taking money out of an account, he lied about whether he had misdirected the money and reactively forged documents to try to persuade the victims. He did this to buy time in order to obtain the money through his other ventures, including the failed productions for which he was raising money. These were not especially complex means or premeditated such that this enhancement should apply.[15]  The typical application of this enhancement is for much more sophisticated means that would act to prevent detection of the criminal conduct. That is not what happened here.

**B.    Zero Point Offender - USSG § 4C1.1**

---

[12] *See United States v. Jenkins-Watt*, 574 F.3d 950, 965 (8th Cir. 2009) (affirming application of the sophisticated means enhancement).

[13] *See United States v. Patterson*, No. 22-10113, 2023 WL 3073103, at *1 (9th Cir. Apr. 25, 2023) (compiling cases upholding sophisticated means enhancement more egregious than an offender who directly dealt with victims).

[14] U.S.S.G. §  2B1.1(b)(10)(C) cmt. n.9(B).

[15] The Sentencing Guidelines Commission note that only 11.9% of all 2B1.1 defendants are also given the Sophisticated Means enhancement. See United States Sentencing Commission, Use of Guidelines and Specific Offense Calculations Based: Fiscal Year 2023, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2023/Ch2_Guideline_FY23.pdf.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

The Guidelines explicitly authorize a sentencing court to depart downward for a first time offender in Mr. Ozer's position at the time he pleaded guilty to the instant offenses. Probation has elected NOT to grant Mr. Ozer this departure under its guidelines calculation because one of the victims claims to have suffered financial hardship from the instant crime. Mr. Ozer accepts the responsibility for committing the crimes of conviction, but he is *not responsible* for the *choices of others* and how they may have managed their finances. Mr. Ozer did not object to the specific conduct enhancement that applies because one of the victims has asserted financial hardship, because he understands that the victim may in fact have suffered such hardship, and the burden of production for the enhancement to apply is modest. However, Probation impermissibly relied on the application of that enhancement to also find that Mr. Ozer is not also eligible for the departure under **§**4C1.1. This "double-counting" of the financial hardship is not only an inaccurate application of the guidelines, it unfairly punishes Mr. Ozer for the unreasonable choice of one victim to *choose* not to pay back an existing financial obligation in favor of a risky profit-generating investment. It was the default on the existing financial obligation that directly led to the victim's financial hardship, not Mr. Ozer's failed production opportunity.

USSG **§**4C1.1 excludes only those who "*personally* caused substantial financial hardship", in contrast to the **§**2B1.1 enhancement. This distinction is further clarified in the Commentary, which states that this exclusion must be found separately

from the §2B1.1 enhancement.[16]  Given that the individual's substantial financial hardship resulted from a default on her pre-existing financial obligations, specifically high-interest loans taken out by her realty entity, Mr. Ozer cannot be seen to have "personally caused" this hardship for purposes of §4C1.1. A defendant's punishment ought not to be increased because of financial arrangements a victim made *a priori*.

Notably, even if the Court believes that Mr. Ozer does not technically qualify for a departure under §4C1.1, it is permitted to grant a similar reduction through a variance, and such accommodation would be appropriate here.[17]

## C.    Coercion and Duress – USSG § 5K2.12

A central feature of this case, and agreed to in the plea agreements, is the application of the § 5K2.12 departure for Coercion and Distress. The predicate conditions apply here, as Defendant was subjected to blackmail and extortion, a form of coercion and duress, that drove him to commit the offense to pay the extortionist. The evidence of this extortion is found in the extensive messages and posts detailing the threats to Mr. Ozer, his wife, his son, his business partners, co-workers and others, and includes evidence of Ozer's efforts to avoid the situation, such as reporting the

---

[16] *See* USSG § 4C1.1 cmt. n.1 ("The application of subsection (a)(6) is to be determined independently of the application of subsection (b)(2) of §2B1.1 (Theft, Property Destruction, and Fraud).").

[17] Whether framed as a downward departure or a variance under the court's § 3553(a) analysis, appellate courts review such determinations, if challenged, as part of the sentence's substantive reasonableness. *United States v. Sicaros-Tamayo*, No. 21-30086, 2022 WL 522284, at *1 (9th Cir. Feb. 22, 2022).

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

blackmail to authorities. For §5K2.12 to apply, the evidence merely needs to demonstrate that it played a substantial role in Mr. Ozer's crimes. In fact, as evident even in the early days of the extortion, Mr. Ozer did not commit these crimes until he felt like he was backed into a corner with the untimely risk of serious and catastrophic personal, reputational and financial harm. While some would not have fallen for this scam, given where Mr. Ozer was at the time, he was particularly vulnerable to it. Notably, he was not alone, as others made similar reports about the same extortionist, one even being forced to send Mr. Ozer money as a pass-through by the extortionist.[18]

A departure under this guideline is in the sound discretion of the court.[19] Valuing the extent of an appropriate departure under **§**5K2.12 is more art than science.[20] We would not be here without the extortion at issue, and this central aspect of the case ought to be weighed heavily in deciding an appropriate departure. Considering that the extortionist was responsible for almost all of the loss-amount in this case ($379,000 versus $421,496 total loss), the context suggests a substantial departure is appropriate. One principled departure method is to look at the difference between these values to suggest an approximation for the harm as calculated under **§**2B1.1. Consequently, approximating how much of the loss was attributable to

---

[18] *See* EXHIBIT 8 (MG Report of Similar Extortion by Extortionist)

[19] *See United States v. Lopez-Garcia*, 316 F.3d 967, 973 (9th Cir. 2003) (affirming lower court's declination to depart from guidelines under § 5K2.12).

[20] *See, e.g., U.S. v. Sandoval-Bustamante*, 451 F. App'x 660, at **1 (9th Cir. 2011) (affirming reasonableness of two-level downward departure under § 5K2.12); *U.S. v. Lipsey*, 62 F.3d 1134, 1137 (9th Cir. 1995) (same).

DEFENDANT'S SENTENCING MEMORANDUM

imperfect coercion and duress is a principled concept to mitigate the arbitrariness of the §2B1.1 guidelines. Here, the $41,000 difference between the extortionate amount and the loss amount would result in a §2B1.1 loss level of 6, which would be an 6 point decrease from the offense level as calculated in the PSR. Such a departure is reasonable here.

### IV.    VARIANCE

#### A.    Section 3553(a) Sentencing Factors

The guidepost for courts in determining a reasonable sentence is that the sentence be sufficient *but not greater than necessary* to serve the sentencing purposes set forth under 18 USC § 3553(a)(2),[21] after considering the § 3553(a) sentencing factors.[22] Although the Court must consider the Sentencing Guidelines, they are not entitled to more weight than any other § 3553(a) sentencing factor.[23] The Supreme Court has emphasized that "[t]he Guidelines are not only *not mandatory* on sentencing

---

[21] The four sentencing purposes under 18 U.S.C. § 3553(a)(2) are: (A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

[22] The seven sentencing factors under 18 U.S.C. § 3553(a) are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the four sentencing purposes; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established by the Sentencing Commission; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.

[23] *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

courts; they are also not to be *presumed* reasonable."[24]  "[E]xtraordinary circumstances are not needed to justify a sentence outside the guidelines range."[25]

Notably, the Ninth Circuit has recognized that § 3553(a) sentencing purposes may be met through a non-custodial sentence even where not recommended by the Guidelines. In *United States v. Edwards*, the Ninth Circuit reasoned that § 3553(a) does not require that sentencing goals be met through a period of incarceration. [26] It also expressed that it may "*very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose*."[27]  This is where we find ourselves.

### B.    The Nature and Circumstances of the Offense

Mr. Ozer ultimately participated in a series of fraudulent actions, but they were largely opportunistic and motivated not by greed, but the desire to spare himself and his family from the shame, business consequences, and the pain of public disclosure of his virtual dalliance. Further, one victim, Ravenwood, has been made whole through Strong Global, and Mr. Ozer may make the individual victims reasonably whole again with gainful employment, to which his event marketing efforts during the pendency of this case demonstrate his capacity. Unlike many cases this court sees, the restitution amount here is not absurd and is potentially achievable with someone

---

[24] *Nelson v. United States*, 555 U.S. 350, 352 (2009).
[25] *United States v. Ruff*, 535 F.3d 999, 1002 (9th Cir. 2008).
[26] *United States v. Edwards*, 595 F.3d 1004, 1017 (9th Cir. 2010).
[27] *Id.* at 1016 (citation omitted), 1016 n.9 (emphasis added).

DEFENDANT'S SENTENCING MEMORANDUM

1  with Mr. Ozer's skills, should he be permitted to live in the community and be able

2  to work in skilled positions that he has his whole life.

### C.    Deterrence, Protection of the Public, and Mr. Ozer's Personal History and Characteristics.

Concerning specific deterrence and the need to protect the public, the likelihood that Mr. Ozer will reoffend in this manner is non-existent. While true that subsequent charges were brought against Mr. Ozer, those offenses occurred simultaneously to the initial matter and were born of the same motivation and circumstances. The Ninth Circuit has recognized that general deterrence is often served by probation in the appropriate case.[28] Research suggesting that the certainty of getting caught that deters crime—not the severity of the punishment, supports the Ninth Circuit's conclusion.[29]

Relatedly, this Court must also consider Mr. Ozer's personal history and characteristics, including the steps he has taken to seek mental health counseling and to begin rebuilding his life with reinventing his occupation in a way that he can sustainably earn to support his family and repay his victims. These factors are

---

[28] *See Edwards* 595 F.3d at 1016–17 n.9 (rejecting argument that goal of general deterrence under §3553(a) must be met through incarceration).

[29] *See, e.g.,* Oliver Roeder, Lauren-Brooke Eisen, and Julia Bowling, *What Caused the Crime Decline?*, Brennan Ctr. for Just., Feb. 12, 2015, at 26 ("The National Academy of Sciences (NAS) concluded that 'insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects.'"); Community Corrections Collaborative Network, *Myths and Facts: Why Incarceration is Not the Best Way to Keep Communities Safe*, Nat. Inst. of Corr. 2016, at 2 ("Research suggests that incarceration does *little to change a person's behavior*.") (emphasis added).

DEFENDANT'S SENTENCING MEMORANDUM

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

significant here and warrant a variance.

Mr. Ozer has cared for others and put their needs before his own throughout his life. The stress of this case has simply been too much to bear for his marriage. Mr. Ozer's and his wife's families came to rely upon Mr. Ozer as a trusted leader, and he helped his in-laws and his family as a matter of course. For more than four years until his recent death, Mr. Ozer and his wife cared for his father-in-law. In addition to being a husband, father, brother, and caretaker, Mr. Ozer has devoted countless hours to his community. Mr. Ozer's community service is not a newfound passion; it is a commitment he has kept throughout his life despite working full time.[30]

### D.    Providing Just Punishment and Promoting Respect for the Law

A non-custodial sentence can and often does satisfy the need for retribution and punishment.[31]  As the *Edwards* court acknowledged, "carefully crafted specific probationary terms" designed to address the particulars of the offense, including strict financial conditions, can "carry specific punitive weight."[32]  The Guidelines include countless possible mandatory, standard, and special conditions that courts may choose from, in addition to fashioning their own. They also recognize that home detention may be imposed as a condition of probation if imposed as a substitute for

---

[30] The Court is encouraged to read the cross section of supportive letters in EXHIBIT 9 (Letters of Support).

[31] *See Edwards* 595 F.3d at 1016–17 n.9.

[32] *Id.* at 1016 n.9; *see also id.* at 1011 n.2

DEFENDANT'S SENTENCING MEMORANDUM

imprisonment.[33]  Simply put, probation *is* punishment.

In addition to whatever confinement or conditions this Court imposes, Mr. Ozer will be obligated with a restitution judgment for much of his life and at least for the near future, will be unable to accumulate much beyond his needs. Further, beyond any punishment this Court may impose, Mr. Ozer has and will continue to suffer the personal and professional consequences of these convictions. Mr. Ozer has tremendous guilt about the hardship this case has caused his family and his very public shaming has reinforced the power and accountability of the law.

### E.    The Need to Provide Restitution

The need to provide restitution to any victims of the offense is another sentencing factor for this Court to consider. The Ninth Circuit has recognized that this goal is "better served by a non-incarcerated and employed defendant."[34]  Though longer prison terms cannot be substitutes for monetary penalties or used to punish a defendant's inability to pay restitution,[35] "[a] sentencing court is empowered to consider whether the victims will receive restitution from the defendant in varying from the Sentencing Guidelines based on § 3553(a) factors."[36]  Such a variance is

---

[33] *See* USSG § 5B1.3(e)(2).

[34] *United States v. Rangel*, 697 F.3d 795, 804 (9th Cir. 2012); *see also United States v. Burgum*, 633 F.3d 810, 814–15 (9th Cir. 2011) (reaffirming that a district court may consider a defendant's ability to pay restitution in deciding to impose a more lenient sentence but may not treat a defendant's inability to pay as an aggravating factor).

[35] *Burgum*, 633 F.3d at 814–15.

[36] *Rangel*, 697 F.3d at 803.

even more appropriate here, where, at 59 years old, Mr. Ozer has limited working years remaining in which to make restitution. Unlike in many fraud cases, Mr. Ozer will have the ability to make restitution, especially if he is not in custody and able to work in skilled positions that he has been able to work throughout this case.

As evident in the attached reimbursement accounting, Safehaven 2022 was reimbursed for the amount that Defendant had taken out of the account by Strong Global, who submitted an insurance claim and apparently received payment for that. Defendant also had paid back $4,000 into the account prior to being charged in these cases. In addition, Defendant made payments of $4,141.48 to Ri. R, and payments of $18,100 to C.C. *See* EXHIBIT 6 (Documentation of Payments of Certain Restitution Obligations). A revised restitution outstanding amount should be $395,254.52, and the amount outstanding to each victim should be modified accordingly. The entity entitled to reimbursement for the Safehaven embezzlement is not Ravenwood, who has been made whole, but rather Strong Global's insurance carrier.

## F. Avoiding Unwarranted Sentencing Disparities

Courts appear to widely recognize that sentencing purposes may be met through a non-custodial or below-guideline sentence. In fiscal year 2024, only 41.4% of defendants sentenced under § 2B1.1 received a sentence within the guideline range.[37] For the past decade, the *average* sentence under § 2B1.1 regardless of

---

[37] *See* U.S. Sentencing Commission, *Table E-7: Sentence Imposed Relative to the Guideline Range for Economic Offense Cases (Fiscal Year 2024)*,

DEFENDANT'S SENTENCING MEMORANDUM

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

criminal history category has consistently remained between 20–24 months.[38] A sentence in the range of 12–18 months thus would not result in an unwarranted sentencing disparity between Mr. Ozer and other defendants sentenced under §2B1.1, as such sentence is near average. However, this average obviously includes many fraud cases that do not involve the mitigating circumstances present here.

### G.  Policy Variances

Courts and scholars have long commented that § 2B1.1 lacks empirical support and have taken particular issue with its overemphasis on loss amount. Federal judges have referred to the fraud guidelines as "a black stain on common sense;"[39] "patently unreasonable" and "so run amok that they are patently absurd on their face;"[40] "of no help;"[41] and "fundamentally flawed."[42] "[A]s with a wide range of critics, federal judges lack sufficient confidence in the policies underlying the [fraud] guideline and the ranges it produces," resulting in frequent below-guideline sentences.[43]

---

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/TableE7.pdf (last accessed April 21, 2025).

[38] *See* U.S. Sentencing Commission, Figure E-4: Sentence Length in Economic Offense Cases Over Time, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/FigureE4.pdf (last accessed April 21, 2025).

[39] *United States v. Parris*, 573 F.Supp.2d 744, 754 (E.D.N.Y. 2008).

[40] *United States v. Adelson*, 441 F.Supp.2d 506, 506, 515 (S.D.N.Y. 2006).

[41] *United States v. Watt*, 707 F.Supp.2d 149, 151 (D. Mass. 2010).

[42] *United States v. Corsey*, 723 F.3d 366, 377, 380 (2d Cir. 2013) (Underhill, J., concurring).

[43] *See* Mark W. Bennett et al., *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939, 989 (Mar. 2017)

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Because the starting point under §2B1.1 is so high, Mr. Ozer is left facing a significant period of imprisonment despite the Probation Office's recognition that a substantial variance is warranted under § 3553(a), and before any application of the coercion and duress departure under § 5K2.12. This Court should consider whether the guidelines calculation in this case is appropriate and proportionate to the harm and the mitigating factors here.

## V.    Conclusion

For the reasons stated above, Defendant respectfully requests that the Court issue a merciful sentence, varying from the Guidelines calculation and that is no greater than that necessary to serve the interests of justice.


Respectfully submitted,


Dated:  April 22, 2025                              SAUL EWING LLP


                                                    By: *s/ Aloke Chakravarty*
                                                         Aloke Chakravarty
                                                         Attorney for Defendant
                                                         David Ozer

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2025, I electronically filed the document described as DEFENDANT'S SENTENCING MEMORANDUM with the Clerk of the Court using the CM/ECF System, resulting in an automatic transmission of a Notice of Electronic Filing to all counsel of record in the above-referenced proceeding.

_s/ Aloke Chakravarty_
Aloke Chakravarty

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100